[Cite as *State v. Furmage*, 2022-Ohio-1465.]

# IN THE COURT OF APPEALS OF OHIO
## ELEVENTH APPELLATE DISTRICT
## ASHTABULA COUNTY

| | |
|---|---|
| STATE OF OHIO, | **CASE NO. 2020-A-0057** |
| Plaintiff-Appellee, | |
| - v - | Criminal Appeal from the Court of Common Pleas |
| JUSTIN R. FURMAGE, | |
| Defendant-Appellant. | Trial Court No. 2019 CR 00676 |

**O P I N I O N**

Decided: May 2, 2022
Judgment: Affirmed

*Colleen M. O'Toole*, Ashtabula County Prosecutor, and S*helley M. Pratt*, Assistant Prosecutor, 25 West Jefferson Street, Jefferson, OH 44047 (For Plaintiff-Appellee).

*Jay Milano* and *Katelyn Pruchnicki*, Milano Law Building, 2639 Wooster Road, Rocky River, OH 44116 (For Defendant-Appellant).

THOMAS R. WRIGHT, P.J.

{¶1} Appellant, Justin R. Furmage, appeals the judgment sentencing him to an aggregate prison term of 115 years to life plus 40 years following jury verdicts finding him guilty on eight counts of rape and eight counts of gross sexual imposition.

{¶2} The charges stem from allegations that Furmage repeatedly sexually abused his stepdaughter when she was between the ages of 7 and 12. Furmage was indicted on eight counts of rape in violation of R.C. 2907.02(A)(1)(b), felonies of the first degree, and eight counts of gross sexual imposition in violation of R.C. 2907.05(A)(4)/(C)(2), felonies of the third degree. The indictment sets forth the following

eight time-periods during which one count each of gross sexual imposition and rape were charged: (1) February 13, 2014 through May 2014; (2) June through August 2014; (3) September 2014 through May 2015; (4) June 2015 through August 2015; (5) September 2015 through May 2016; (6) June 2016 through August 2016; (7) September 2016 through February 22, 2017; and (8) March 3, 2017 through July 30, 2019.

{¶3} Prior to trial, Furmage filed a motion in limine to exclude all evidence and testimony regarding a separate importuning case in which he had been charged. The trial court ruled that only evidence related to the present case would be permitted unless Furmage decided to testify, in which case evidence of other criminal activities could be used for impeachment purposes.

{¶4} The matter proceeded to jury trial, after which the jury returned guilty verdicts on all counts. Thereafter, the court imposed a prison sentence as follows: 15 years to life on each of the first seven rape counts, 10 years to life on the remaining rape count, and 60 months on each of the eight counts of gross sexual imposition, with all sentences to be served consecutively.

{¶5} In his first assigned error, Furmage contends:

{¶6} "Appellant's convictions for rape and gross sexual imposition are against the manifest weight of the evidence and not supported by sufficient evidence."

{¶7} In reviewing a challenge to the sufficiency of the evidence, an appellate court views the evidence in a light most favorable to the prosecution. *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). Sufficiency is "'a term of art meaning that legal standard which is applied to determine whether the case may go to the [finder of fact] or whether the evidence is legally sufficient to support the * * * verdict as a matter of

2

law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting *Black's Law Dictionary* 1433 (6th Ed.1990). "In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law." (Citation omitted.) *Thompkins* at 386.

> Although a court of appeals may determine that a judgment of a trial court is sustained by sufficient evidence, that court may nevertheless conclude that the judgment is against the weight of the evidence.  * * * Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them.  Weight is not a question of mathematics, but depends on its effect in inducing belief."

(Emphasis deleted.) *Thompkins* at 387, quoting *Black's* at 1594.

{¶8}   In determining whether a conviction is against the weight of the evidence, we review "the entire record, weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Id.,* quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   A determination that a defendant's conviction is supported by the weight of the evidence includes a conclusion that sufficient evidence supports the conviction.  (Citation omitted.) *State v. Masters*, 11th Dist. Lake No. 2019-L-037, 2020-Ohio-864, ¶ 17.

{¶9}   Here, the jury found Furmage guilty of rape, in violation of R.C. 2907.02(A)(1)(b), and gross sexual imposition, in violation of R.C. 2907.05(A)(4).  R.C. 2907.02(A)(1)(b) provides, "No person shall engage in sexual conduct with another * * *

3

when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." The trial court sentenced Furmage based upon the jury's additional finding that the victim was less than 10 years of age at the time of seven of the charged rapes. *See* R.C. 2971.03(B)(1)(b). R.C. 2907.05(A)(4) provides, "No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when * * * the other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person."

{¶10} In support of the charges, at trial, the state presented the testimony of the victim, the victim's mother, a friend of the victim's mother, the victim's grandmother, a Children Services investigative caseworker, and the detective that investigated this case.

{¶11} The victim, who was 13 years of age at the time of trial, testified that after her mother and Furmage began seeing each other, when the victim was about seven years old, they moved into a yellow house. Furmage had an office in the basement of the yellow house, where he would play the "tickle game" with the victim nearly every day. The "tickle game" consisted of Furmage putting his hand down the victim's pants and rubbing her vagina. Sometimes he would insert a finger into her vagina. Furmage had also placed the victim's hand on his penis under his clothing. The victim did not at that time know that there was anything wrong with the "tickle game," but Furmage told her not to tell anyone about the game because "bad stuff" could happen to her, her mom, and her siblings, and because Furmage would get in trouble. The victim estimated that Furmage touched her vagina on approximately 30 occasions, with digital penetration occurring 10 to 15 times, while they resided at the yellow house.

4

{¶12} The victim further testified that they moved from the yellow house into a two-story house in 2017, when she was 10 years old. When they moved, their new house included a first-floor room that Furmage used as an office. Although he did not touch her as much in the new house as he had in the yellow house, the victim maintained that Furmage continued to play the "tickle game" with her in his home office approximately once per week until shortly before she turned 12 years old. The victim estimated that digital penetration occurred on approximately five occasions at the two-story house. In addition, the victim maintained that Furmage showed her pictures of his penis on his phone, and at one point he unsuccessfully attempted to insert his penis into her vagina. The victim told her mother about the abuse shortly after Furmage was arrested in a separate case.

{¶13} The victim's mother testified that when the victim disclosed the abuse, she called Detective Taylor Cleveland, who suggested that she take the victim for a forensic interview at Children Services. The caseworker who conducted the interview with the victim authenticated a recording of that interview, which was published for the jury and admitted into evidence.

{¶14} The victim's mother maintained that she continued to speak with Furmage after the victim's disclosure because he had not yet been charged in the victim's case and she did not want to tip him off that anything was awry. After charges were brought against him, the victim's mother testified that Furmage offered to pay $1000 to the victim if she recanted. The victim's grandmother also testified that Furmage had told her that he would pay the victim $1000 if she recanted. On cross-examination of the grandmother,

5

she denied making statements to Furmage that she would back him up in court or that she believed the victim was lying.

{¶15} In addition to the purported bribe, a significant amount of the state's evidence focused on a typed letter allegedly found in Furmage's truck. The letter was entered into evidence by the state. The letter appears wrinkled, dirty, somewhat ripped and worn, and contains typed page numbers on the bottom of each page. The bottom half of one page and top half of another appear to have been ripped off, and the pages contain a crease in the center indicating that they had been folded in half. The handwritten numbers 1, 2, and 3, appear at the top of certain pages. The substance of the letter contains graphic sexual propositions, invites the recipient to respond as to whether she would be willing to engage in these sex acts, and questions how much she would charge for specific acts. The letter is not signed, and the intended recipient is not named. However, the letter contains references to the author previously vaginally massaging and performing oral sex on the recipient in the basement of the "yellow house" and playing the "tickle game." The victim testified that Furmage attempted to give her the letter while they were alone in his truck in August 2019. She told Furmage that she did not want the letter and did not know what Furmage did with the letter after that, but he told her that he threw it away.

{¶16} Misty, a friend of the victim's mother and of Furmage, testified that she and her boyfriend, Daniel, borrowed Furmage's truck in August 2019. While cleaning off the floorboard on the passenger side of the truck, Misty came across this letter. Misty then held onto the letter for approximately two weeks before giving it to the victim's mother. She delayed because of the disturbing nature of the letter. The victim's mother testified

6

that Misty notified her about the letter the day after borrowing the truck, and the mother notified Detective Cleveland. The victim's mother gave the letter to the detective on the same day as the victim's interview with Children Services, which the caseworker testified occurred on August 20, 2019. On cross-examination, the victim's mother could not recall if she had a telephone conversation with Furmage's brother the day prior to the letter being found. However, she acknowledged that she may have had conversations with Furmage's brother concerning the son she and Furmage share, but she could not remember the extent of the conversations because she was in a "bad place" at that time and was using methamphetamines.

{¶17} Detective Cleveland reported that the victim's mother told him that she found the letter when cleaning out the truck. On cross-examination of Detective Cleveland, he confirmed that law enforcement had confiscated Furmage's laptop and sent it to the Cyber Crimes Unit of the Bureau of Criminal Investigation ("BCI") to search for the keywords "tickle," "yellow," and "basement," which were all used in the typed letter. The detective confirmed that a report from BCI had been returned to the prosecutor's office. At that point, an off-the-record discussion between the court and counsel was held. When cross-examination resumed, defense counsel did not continue questioning regarding the BCI report from Furmage's laptop.

{¶18} The defense declined to make a Crim.R. 29 motion at the close of the state's case-in-chief. As part of the defense's case, counsel elicited testimony from friends and family of Furmage, Misty's prior boyfriend Daniel whom she referenced in her testimony above, and prior friends of the victim. The defense further recalled the victim's grandmother.

7

{¶19} One of Furmage's friends testified that he lived with Furmage at the yellow house in the basement for about two years. In addition, Furmage's daughter testified that she lived with Furmage in the yellow house from approximately 2014 to 2015, and her bedroom was in the basement. She maintained that the victim did not come into the basement very much. Furmage's daughter also lived with the family at the two-story house. Furmage's friends and family testified that they were frequently at the two-story house, and two of the friends testified that they lived at that house for certain periods of time. These witnesses did not see anything inappropriate between the victim and Furmage and indicated that it did not appear to them that the victim was afraid of Furmage. The witnesses further testified that several children resided at the houses, and the family's adult friends frequently visited the two-story house.

{¶20} Daniel testified that he borrowed Furmage's truck for two days around August 2019. The truck was "a wreck" inside. He did not recall anyone else using the truck with him, and he had no knowledge of the letter that was admitted into evidence.

{¶21} Furmage's brother testified that he spoke with the victim's mother regarding the son that she and Furmage share. Furmage's brother maintained that the day before he became aware of the letter, he had told the victim's mother that she needed to be a more "respectable" mother to her and Furmage's son so that she and Furmage could raise the child without intervention of Furmage's brother and parents.

{¶22} One of Furmage's friends, Shauna, testified that she regularly babysat for Furmage. She maintained that she was at the two-story house in August 2019 when the victim's mother was making copies of the letter. Shauna maintained that the letter that was introduced into evidence was in a different condition than the letter when she read it,

8

and the victim's mother put page numbers on the copies. Furmage's daughter also testified that she looked at the letter, and the victim's mother read it to her at the two-story house. Furmage's daughter maintained that the letter that was admitted into evidence was different than the letter the victim's mother had shown her at the two-story house, as it previously had not been divided into three parts, did not contain page numbers at the top, and none of the pages were cut in half.

{¶23} H.S. testified that she was friends with the victim and frequently stayed overnight in the victim's home in 2018 and 2019. H.S. learned about the victim's accusations against Furmage when the victim's mother gave her the letter to read at the victim's house. H.S. maintained that the letter introduced into evidence differed from the letter that she read because there were no top or bottom page numbers on the letter she read, and some of the wording was different.

{¶24} H.S. further testified that she recorded a telephone conversation between herself and the victim on July 7, 2020. The recording was published to the jury. During this conversation, the victim indicated that she was not raped, but she had to cooperate with the prosecution or she and her mother would get into trouble. H.S. testified that Shauna's daughter, M.B., was a mutual friend of hers and the victim, and M.B. was present with H.S. during the telephone call.

{¶25} M.B. testified that she has known Furmage her entire life. M.B. testified that the victim's mother was "showing off" the letter when she was at their house in the summer of 2019. However, she maintained that the letter admitted into evidence had been altered, as it had previously been in one packet, not divided into three, was clean and folded, and did not contain page numbers.

9

{¶26} On cross, M.B. acknowledged that Detective Cleveland had interviewed her at her school regarding Furmage, and she had told the detective that Furmage told her that she was "hot" and had shown her a picture of his penis on his phone. However, M.B. denied that she had told the detective that Furmage offered to be her "uncle sugar daddy" and was attempting to contact her through Snapchat. Thereafter, M.B. maintained that the victim's mother had forced her to tell the detective horrible things about Furmage, threatening that she would be in trouble otherwise. However, she denied that she told the detective that she was trying to distance herself from Furmage and maintained that she was very upset during the interview.

{¶27} Furmage's son testified that when he was a boy scout, Detective Cleveland was his leader from 2017-18, and the detective had used the phrase "tickle game."

{¶28} The defense recalled the victim's grandmother, at which time it played audio of telephone conversations between the victim's grandmother and Furmage, containing statements that the grandmother denied making when the defense had earlier questioned her on cross-examination. In the first recording played, the grandmother said to Furmage: "Like I said, I'll back you up in court." The second recording provides:

> [Victim's grandmother]: "[The victim] is the one that needs to be ashamed that she lied."
>
> Justin Furmage: "Yeah, you're d*mned right. You know?"
>
> [Victim's grandmother]: "It's all on [the victim]."

{¶29} The victim's grandmother acknowledged her voice in these recordings, but she maintained that she was drinking heavily during the time period that these conversations were recorded and did not recall making these statements. She further indicated that she no longer believed the statements that she had made to Furmage.

10

**{¶30}** After the defense rested, the state called Detective Cleveland to rebut the testimony of certain witnesses. The detective testified that he never used the term "tickle game" in boy scouts. Further, the detective authenticated an audio recording of the interview between himself and M.B., wherein M.B. states that Furmage told her "how hot" she was and then showed her a picture of his penis. After she asked him not to show her that, Furmage offered to be her "uncle sugar daddy or something like that." M.B. then states that she had to remove Furmage from Snapchat because he would not leave her alone.

**{¶31}** In support of his argument that the weight of the evidence did not support the convictions, Furmage points to inconsistencies in the victim's testimony; the victim's mother's purported motive to lie about the letter; inconsistencies in the testimony regarding the letter; and the lack of a BCI report regarding the search of Furmage's laptop.

**{¶32}** We recognize that the victim's testimony regarding the frequency of incidents was internally inconsistent, as she testified that Furmage inappropriately touched her nearly every day during the time that she resided at the yellow house, from ages seven to ten. This testimony would indicate hundreds of instances of sexual contact, yet the victim also estimated that Furmage engaged in this behavior approximately 30 times at the yellow house. Despite the inconsistency as to the frequency of the offenses, it was within in the province of the jury to reconcile this discrepancy. *See State v. Rice*, 11th Dist. Ashtabula No. 2009-A-0034, 2010-Ohio-1638, ¶ 49 (finder of fact "entitled to reconcile inconsistencies in the testimony and free to believe all, some, or none of the testimony").

11

**{¶33}** Regarding the victim's mother's motive to lie about the letter, Furmage maintains that she was motivated to create this letter due to Furmage's brother's statements regarding removal of her son from her custody. It is not clear how Furmage's brother's discussions with the victim's mother regarding her son would motivate the victim's mother to draft a letter to corroborate abuse of the victim, but to the extent that such a motive could be inferred, the jury had before it the testimony of the victim and Misty. The victim testified that the letter admitted into evidence was the letter Furmage attempted to give her in his truck, and Misty testified that she found the letter on the floorboard of that truck and ultimately gave it to the victim's mother.

**{¶34}** In addition, although the victim's mother testified that Misty gave her the letter the day after she borrowed the truck, and Misty testified that she gave it to her two weeks after borrowing the truck, it was again within the jury's province to resolve this discrepancy. Moreover, although Furmage's daughter, Shauna, H.S., and M.B. testified that the letter was in a different condition than the letter the victim's mother showed them, it is unclear if the witnesses had previously viewed the letter in its original form or a copy of the letter made by the victim's mother. Further, Daniel's testimony that he never saw the letter in the truck is not inconsistent with Misty's testimony that she found the letter on the floorboard. To the extent that the testimony regarding the letter did conflict, the jury is in the best position to judge the credibility of witnesses through direct observation of the demeanor and tone of the witnesses while testifying. *See Masters*, 2020-Ohio-864, ¶ 19. Additionally, although the letter was heavily relied upon during the proceedings, the jury was not required to believe the letter to be written by Furmage to find Furmage guilty of rape or gross sexual imposition.

12

**{¶35}** Regarding the lack of a BCI report for Furmage's laptop, the defense wished to elicit testimony to indicate that the BCI investigation of the laptop revealed no evidence of the letter. However, the laptop was confiscated for purposes of the importuning case, which was the subject of Furmage's motion in limine. After the cross-examination of Detective Cleveland in the state's case-in-chief, outside of the presence of the jury, the court discussed the issue of the BCI report with counsel and concluded that the report was properly excluded. Furmage does not challenge this ruling but relies on the lack of a BCI report to support his argument as to the lack of evidence regarding Furmage authoring the letter. Again, as set forth above, the jury had before it testimony regarding the letter from which it could determine its authorship, but it was not required to find Furmage authored the letter, or that he did so on the confiscated laptop, to find him guilty of the offenses.

**{¶36}** After review of the record, this is not a case where the jury "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, 78 Ohio St.3d at 386. Accordingly, we conclude that the convictions are not against the manifest weight of the evidence and thus necessarily supported by sufficient evidence. *See Masters*, 2020-Ohio-864, at ¶ 17. Therefore, Furmage's first assigned error lacks merit.

**{¶37}** In his second assigned error, Furmage asserts:

**{¶38}** "Appellant was denied his constitutional right to a fair trial when the trial court permitted the State of Ohio to elicit improper opinion testimony from a witness during its case-in-chief in violation of Rule 701 of the Ohio Rules of Evidence."

Case No. 2020-A-0057

{¶39} "The admission or exclusion of evidence is a matter left to the trial court's sound discretion and will not be disturbed absent an abuse of discretion." *State v. Parks*, 11th Dist. Lake No. 2019-L-097, 2020-Ohio-4524, ¶ 94, citing *State v. Dunn*, 8th Dist. Cuyahoga No. 101648, 2015-Ohio-3138, ¶ 40.

{¶40} "'"[T]he term abuse of discretion' is one of art, connoting judgment exercised by a court, which does not comport with reason or the record."'" *Parks* at ¶ 95, quoting *Ivancic v. Enos*, 11th Dist. Lake No. 2011-L-050, 2012-Ohio-3639, 978 N.E.2d 927, ¶ 70, quoting *State v. Underwood*, 11th Dist. Lake No. 2008-L-113, 2009-Ohio-2089, ¶ 30, citing *State v. Ferranto*, 112 Ohio St. 667, 676-678, 148 N.E. 362 (1925). "'[A]n abuse of discretion is the trial court's "failure to exercise sound, reasonable, and legal decision-making."'" *Parks* at ¶ 95, quoting *Ivancic* at ¶ 70, quoting *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting *Black's Law Dictionary* 11 (8 Ed.Rev.2004).

{¶41} Furmage challenges the admission of opinion testimony elicited from the victim's mother. The admission of lay opinion testimony is governed by Evid.R. 701, which provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶42} Here, during the state's questioning of the victim's mother, the following exchange occurred regarding the letter referenced in our discussion of the first assigned error:

> Q. Who wrote the letter?
>
> A. Justin

14

Case No. 2020-A-0057

[DEFENSE COUNSEL]: Objection

THE COURT: Overruled.

[DEFENSE COUNSEL]: It's an opinion.

BY [THE STATE]:

Q. Who was the letter intended for?

A. I think [the victim], but it could have been to anyone.  But things –

Q. Do you know if he ever tried to give it to her?

A. She says that he did.

[DEFENSE COUNSEL]: Objection.

THE COURT: That I'll sustain.

{¶43} During cross-examination, defense counsel inquired of the victim's mother regarding the letter:

Q. Okay.  Let's talk about that letter.  First of all, you said that Justin wrote that letter, correct?

A. Yes.

Q. How do you know Justin wrote that letter?

A. Because he's my husband and I know the way he talks.  I know the way he words things, I know the way he spells certain words.

Q. Well, you had a computer, correct?

A. I have a laptop, yes.

* * *

Q.  you would – if you knew what your husband wrote and how he wrote it, you could have wrote that letter yourself, couldn't you?

15

Case No. 2020-A-0057

A. I –

Q. Couldn't you?

A. I didn't write the letter.

Q. I asked if you could have, though.

A. I guess I could have.

{¶44} Furmage maintains that the trial court erred in overruling his objection to the victim's mother's testimony that Furmage wrote the letter. However, her testimony was rationally based upon her perception of the letter, as she had been married to Furmage for several years and familiar with his writing style. *See* Evid.R. 701. This opinion also served to assist in determination of the authorship of the letter, which was a fact in issue. *See* Evid.R. 701. Accordingly, we cannot say that the trial court abused its discretion in overruling Furmage's objection. Therefore, Furmage's second assigned error is without merit.

{¶45} In his third assigned error, Furmage argues:

{¶46} "Appellant was denied his constitutional right to present a full and complete defense by the trial court's exclusion of evidence Appellant sought to introduce on rebuttal to impeach the testimony of a witness called to testify during the State's case-in-chief."

{¶47} The Supreme Court of Ohio has explained:

> In *Chambers v. Mississippi* (1973), 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297, the court recognized that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Although *Chambers* referred to due process, the court has since explained that "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees

16

criminal defendants 'a meaningful opportunity to present a complete defense.'" (Citations omitted.) *Crane v. Kentucky* (1986), 476 U.S. 683, 690, 106 S.Ct. 2142, 90 L.Ed.2d 636, quoting *California v. Trombetta* (1984), 467 U.S. 479, 485, 104 S.Ct. 2528, 81 L.Ed.2d 413, and citing *Chambers*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297; and *Washington v. Texas* (1967), 388 U.S. 14, 23, 87 S.Ct. 1920, 18 L.Ed.2d 1019. As stated in *Crane*, "That opportunity would be an empty one if the State were permitted to exclude competent, reliable evidence * * * when such evidence is central to the defendant's claim of innocence." 476 U.S. at 690, 106 S.Ct. 2142, 90 L.Ed.2d 636.

The court has consistently recognized, however, that this constitutional right is not absolute and does not require the admission of all evidence favorable to the defendant. *See, e.g.*, *United States v. Scheffer* (1998), 523 U.S. 303, 308, 118 S.Ct. 1261, 140 L.Ed.2d 413 ("A defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restriction"); *Taylor v. Illinois* (1988), 484 U.S. 400, 410, 108 S.Ct. 646, 98 L.Ed.2d 798 ("The accused does not have an unfettered right to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules of evidence"); *Rock v. Arkansas* (1987), 483 U.S. 44, 55, 107 S.Ct. 2704, 97 L.Ed.2d 37 ("the right to present relevant testimony is not without limitation").

*State v. Swann*, 119 Ohio St.3d 552, 2008-Ohio-4837, 895 N.E.2d 821, ¶ 12-13.

{¶48} Here, during cross-examination of the victim's mother, defense counsel questioned her as follows:

> Q. Now, actually, you said that Justin offered to pay $1,000 to have [the victim] lie, correct?
>
> A. Correct.
>
> Q. Isn't it a fact that you – isn't it a fact that it was you -- you remember having a conversation Justin (sic.) on or about November the 4th of 2019, telephone conference -- telephone conversations?
>
> A. I'm sure I had conversations, yes.

17

Q. And isn't it a fact that you are the one that said, [the victim] lies for money and would do it for $1,000, you're the one that said that?

A. No, I did not.

{¶49} Thereafter, a discussion was held between the court and counsel outside the presence of the jury. During this discussion, defense counsel played a partial telephone recording that it wished to use to impeach the victim's mother's testimony. Therein, the victim's mother indicated to Furmage that someone, whom the victim's mother identified as "she," would be willing to lie about "it."

{¶50} The trial court then indicated that it would not permit a brief clip of a conversation to be played without having heard the context of the conversation. After the jury left on the second day of trial testimony, counsel played certain audio recordings for the court that counsel wished to use for impeaching the testimony of several witnesses. With respect to impeaching the victim's mother's testimony, the defense played another partial recording, during which Furmage and the victim's mother referenced a "she" that lies, and the victim's mother indicated "she" would lie for $1000, but again, neither state who "she" is.

{¶51} Again, the trial court stated that it wanted more context of the conversation before it would permit the recording. The next morning, defense counsel played a longer recording. However, again, nowhere in the clip of the recording does either Furmage or the victim's mother clearly reference who "she" is that was willing to lie for $1000.

{¶52} After listening to the recording, the trial court concluded that the recording did not contradict the victim's mother's testimony that Furmage offered to pay the victim

18

$1000 to lie, and the comment that "she would lie for $1,000" did not reference who "she" was. The court then determined that the recording would not be permitted.

{¶53} We cannot say that exclusion of this recording violated Furmage's rights to put on a full defense. Although a witness' credibility may be impeached through a prior inconsistent statement, the recording did not contradict the victim's mother's testimony that Furmage offered $1000 to the victim to recant, nor did it clearly identify the "she" that would be willing to "lie" for $1000 so as to contradict the mother's testimony that she did not say that *the victim* lies for money and would be willing to lie for $1000. *See* Evid.R. 607(A) (credibility of a witness may be attacked); Evid.R. 608(B) ("Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid.R. 609, may not be proved by extrinsic evidence."); Evid.R. 613(B) (Extrinsic evidence of a prior inconsistent statement by a witness is admissible where certain conditions are met.); *see also State v. Raia*, 11th Dist. Portage No. 2013-P-0020, 2014-Ohio-2707, ¶ 26. Moreover, the victim's mother was not asked if she stated to Furmage that someone identified as "she" would be willing to lie for $1000 and, if so, for clarification as to whether the "she" in that statement referenced the victim.

{¶54} Given that the prior statement was not demonstrated to be inconsistent, Furmage's third assigned error lacks merit.

{¶55} In his fourth assigned error, Furmage maintains:

{¶56} "Appellant was denied his constitutional right to a fair trial and due process of law when the trial court permitted the State of Ohio to introduce cumulative evidence in rebuttal during Appellant's case-in-chief."

19

{¶57} "The admission of rebuttal testimony is left to the trial court's sound discretion." *State v. Wood*, 11th Dist. Portage No. 95-P-0009, 1996 WL 649132, *11 (June 21, 1996), citing *State v. Finnerty*, 45 Ohio St.3d 104, 543 N.E.2d 1233 (1989) and *State v. Harris*, 8th Dist. Cuyahoga No. 65653, 1994 WL 245685, *11 (June 2, 1994). "[A]dditional evidence which is merely cumulative to evidence presented in the case-in-chief is not proper rebuttal evidence." *Wood* at *11, citing *Weinberg v. Hartzell*, 21 Ohio App. 93, 153 N.E. 106 (1st Dist.1926). "Rebuttal testimony is properly admitted if it is offered to refute evidence presented by the adversary." *Wood* at *11, citing *State v. Hohman*, 81 Ohio App.3d 80, 83, 610 N.E.2d 473 (9th Dist.1991).

{¶58} Here, on cross-examination of M.B., the state questioned her as to whether she made certain statements to the detective during his interview of her. M.B. acknowledged that she told the detective that Furmage had told her how "hot" she was and that Furmage showed her a picture of his penis on his phone. However, she specifically denied that she told Detective Cleveland that she told Furmage not to show her the picture again, that Furmage offered to be her "uncle sugar daddy," and that she told Detective Cleveland that Furmage attempted to contact her through Snapchat. However, when asked if Detective Cleveland would be lying if he took the stand said that she said "those things," M.B. stated, "I said those things, but I was told to say them." It is not clear from the testimony to which of the above statements "those things" referred. M.B. explained that the victim's mother forced her to say horrible things regarding Furmage by threatening that she would get in trouble. Thereafter, the state questioned M.B. as follows:

> Q. Well, you told Detective Cleveland that he told you -- he
> was telling you how hot you were. You told Detective

20

Cleveland that he showed you a picture of his d*ck on his phone. You told Detective Cleveland that he offered to be your uncle sugar daddy. Is that true?

A. All of the things I told Detective Cleveland is what I was told to say.

Q. So, you did say those things to Detective Cleveland?

A. Yes. But they were not true.

{¶59} Thereafter, M.B. said she had never said that Furmage told her she was "hot," and she denied having told the detective that she was trying to distance herself from Furmage.

{¶60} After the second day of trial testimony, outside of the jury's presence, the state requested that the trial court permit it to recall Detective Cleveland on rebuttal and play a recording of the detective's interview with M.B. to refute her testimony. The trial court permitted rebuttal over the defense's objection. During Detective Cleveland's rebuttal testimony, the following portion of the recorded interview was played:

Detective Cleveland: -- " * * * So, what was going on with Justin? Like, what was the scoop that was – was going on there?"

[M.B.]: "Well, basically, like, he was my babysitter my whole life" –

Detective Cleveland: "Mm-hmm."

[M.B.]: -- "when I was little and stuff. And he was also my mom's best friend, and she's known him since she was 15."

Detective Cleveland: "Mm-hmm."

[M.B.]: "And she had me when, um, she was 18. And he was, like, my uncle."

Detective Cleveland: "Mm-hmm."

21

[M.B.]: "Like, he was always my uncle figure in my life."

Detective Cleveland: "Mm-hmm."

[M.B.]: "And then when he had [the son he shares with the victim's mother], I started babysitting [him]."

Detective Cleveland: "Mm-hmm."

[M.B.]: "And, um, he picks me up one day out of the summer to come babysit [his son], and he was basically telling me how hot I was and stuff. And then he showed me a picture of his d*ck, and I said, please do not show me that. And he was, like, oh, my bad. And then he was, like, well, I could be -- what is it called? I could be your uncle sugar daddy or something like that. And I was, like, no. And then, like, I had to remove him on Snapchat and stuff because, like, he wouldn't leave me alone."

{¶61} Furmage argues that the court erred in allowing the rebuttal evidence because M.B. acknowledged during her testimony that she made false statements to the detective during the interview, claiming that the victim's mother forced her to do so.

{¶62} Although M.B. did acknowledge making some statements to the detective, she had initially specifically denied making certain statements, and the testimony was not clear which statements she made were fabricated. Given that this recording contradicts portions of M.B.'s testimony regarding her interview with the detective, we cannot say that the trial court abused its discretion in permitting the recording on rebuttal. Accordingly, Furmage's fourth assigned error is without merit.

{¶63} Furmage concludes his fourth assigned error by stating, "Further, the recording at issue was admitted notwithstanding the fact that it had not been given to Appellant as pretrial discovery," and citing to *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and *State v. Perry*, 80 Ohio App.3d 78, 85, 608 N.E.2d 846 (11th Dist.1992).

22

**{¶64}** Although Furmage cites to *Brady*, he does not further develop an argument on its applicability to the recording at issue here. *See State v. Jalowiec*, 9th Dist. Lorain No. 14CA010548, 2015-Ohio-5042, 52 N.E.3d 244, ¶ 31, quoting *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) ("'There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.'"). Further, an argument as to a purported discovery violation is beyond the parameters set forth by Furmage's fourth assigned error. Accordingly, to the limited extent that an argument with respect to discovery has been made, we decline to address it.

**{¶65}** In his fifth assigned error, Furmage contends:

**{¶66}** "The trial court erred by failing to grant a mistrial after several members of the jury were exposed to extrinsic information by a witness who was called to testify on behalf of the State of Ohio during its case-in-chief."

**{¶67}** "A trial court is entitled to broad discretion in considering a motion for a mistrial, and our standard of review is whether the trial court abused its discretion." *State v. Rosebrook*, 11th Dist. Geauga No. 2016-G-0099, 2017-Ohio-9261, ¶ 9, citing *State v. Love*, 7th Dist. Mahoning No. 02 CA 245, 2006-Ohio-1762, ¶ 95, citing *State v. Schiebel*, 55 Ohio St.3d 71, 564 N.E.2d 54 (1990), paragraph one of the syllabus. "The decision to grant a mistrial 'is an extreme remedy only warranted in circumstances where a fair trial is no longer possible and it is required to meet the ends of justice.'" *Rosebrook* at ¶ 9, quoting *State v. Bigsby*, 7th Dist. Mahoning No. 12 MA 74, 2013-Ohio-5641, ¶ 58, citing

23

*State v. Jones*, 83 Ohio App.3d 723, 615 N.E.2d 713 (2d Dist.1990). "A mistrial will only be granted when the substantial rights of a party are adversely affected." *Rosebrook* at ¶ 9, citing *State v. Lukens*, 66 Ohio App.3d 794, 809, 586 N.E.2d 1099 (10th Dist.1990).

{¶68} Here, Furmage maintains that a mistrial was warranted due to three jurors overhearing a statement made by the victim's grandmother to the bailiff. After the victim's grandmother testified on the defense's rebuttal, the trial court questioned the jury as follows:

> Okay. I have a question for the Jury, and it's really the jurors here but it's all of you. When [the victim's grandmother] apparently came in, was in the courtroom and the lawyers were with me in Chambers, did any of you overhear the content of a conversation between [the victim's grandmother] and my bailiff?

{¶69} The transcript indicates that, in response, three jurors raised their hands. Thereafter, in chambers, the defense requested a mistrial:

> [DEFENSE COUNSEL]: And the second thing is, very obviously, we've had three jurors raise their hand, the ones in the front as I was afraid of, that said they heard what [the victim's grandmother] said; and I believe [the bailiff] -- I don't want to put words in her mouth -- from what I heard, she said that the woman, [the victim's grandmother], said that she had proof on her phone, something to the effect, that Justin, she knew Justin was guilty and he'd done it or something to that effect, and at least three jurors raised their hand and said they heard what she said.
>
> This was, obviously, an attempt to prejudice this Jury, and I think once they've heard that, that they've -- they cannot take -- put this aside and make a decision, and they shouldn't have heard this. And I'm going to ask again for a mistrial based upon these jurors hearing this statement that was not even solicited, not even asked for but volunteered by this witness while we were in Chambers.
>
> THE COURT: I'm going to overrule that motion, also. I'm going to explain to you why. The first thing that the Court will

24

have to do is to send the 11 jurors who indicated they did not hear anything out of the courtroom. I then – I'm going to then separate the three that raised their hand and indicated they did hear it, and then I'm going to conduct a voir dire about what did they hear and depending on what they heard will determine whether or not I have to give them any instructions to disregard and to not tell the rest of the Jury.

[DEFENSE COUNSEL]: Fine. Fine, Your Honor.

**{¶70}** At the conclusion of trial, the court individually questioned the three jurors. The jurors each indicated that they heard the victim's grandmother say to the bailiff that she had "proof." The third juror indicated that when the grandmother indicated she had proof, the bailiff interrupted her and said she could not have that conversation with her. Each of the jurors affirmed that they could put the grandmother's statement out of their minds, render a decision based only on the evidence presented in this case, and refrain from disclosing what they overheard to any other juror.

**{¶71}** Based upon the court's voir dire of the three jurors, we cannot say the court abused its discretion in determining that this was not a case where a mistrial was required to meet the ends of justice.

**{¶72}** Therefore, Furmage's fifth assigned error lacks merit.

**{¶73}** In his sixth assigned error, Furmage asserts:

**{¶74}** "Appellant was denied his constitutional right to a fair trial and due process of law based upon prosecutorial misconduct committed by the State of Ohio throughout trial and during its closing argument."

**{¶75}** "As a general proposition, a two-prong test is employed to decide whether a criminal defendant must be granted a new trial based upon prosecutorial misconduct: (1) were the prosecutor's remarks improper; and (2) was the defendant prejudiced by the

25

remarks?" *State v. Smith*, 11th Dist. Ashtabula No. 2013-A-0066, 2014-Ohio-4984, ¶ 32, citing *State v. Beckwith*, 11th Dist. Ashtabula No. 2013-A-0050, 2014-Ohio-2877, ¶ 36 and *State v. Coleman*, 11th Dist. Portage No. 2013-P-0072, 2014-Ohio-2708, ¶ 21.

{¶76} """Generally, prosecutorial misconduct is not a basis for overturning a criminal conviction, unless, on the record as a whole, the misconduct can be said to have deprived the defendant of a fair trial.""" *Smith* at ¶ 33, quoting *State v. Dudas*, 11th Dist. Lake Nos. 2008-L-109 & 2008-L-110, 2009-Ohio-1001, ¶ 26, quoting *State v. Hillman*, 10th Dist. Franklin Nos. 06AP-1230 & 07AP-728, 2008-Ohio-2341, ¶ 26. "'The focus of that inquiry is on the fairness of the trial, not the culpability of the prosecutor.'" *Smith* at ¶ 33, quoting *Dudas* at ¶ 26, citing *State v. Bey*, 85 Ohio St.3d 487, 495, 709 N.E.2d 484 (1999).

{¶77} Here, Furmage first maintains that the prosecutor engaged in misconduct during his cross-examination of numerous defense witnesses, including questioning of H.S. and M.B., but Furmage does not develop an argument as to when during this questioning such misconduct occurred.

{¶78} Next, with respect to closing argument, Furmage maintains that the prosecutor improperly opined that Furmage paid H.S. to record her telephone conversation with the victim and that two defense witnesses were on drugs when testifying. Relevant to this argument, Furmage relies on the prosecutor's following four remarks made during closing argument:

> [1.] Now, here [in the letter] he's offering to pay her. Just like he offered to pay her, Ladies and Gentlemen, to change her testimony. And just like, I submit, he paid [H.S.] to record a conversation with [the victim]. You heard the testimony of [the victim's grandmother] and [the victim's mother]. He offered to pay [the victim] $1,000 to change her testimony.

26

And I have – I have to say, Ladies and Gentlemen, I have to say that the defendant has been on quite a campaign since he got out of jail on bond, he's been on quite a campaign to influence the witnesses in this case.

[DEFENSE COUNSEL:] Objection, Your Honor.

THE COURT: Ladies and Gentlemen, this is argument. This is not evidence. And I will need you to keep that in mind as you deliberate on this case.

So, the objection is overruled.

* * *

[2.] You heard [the victim]'s testimony, Ladies and Gentlemen, that [H.S.] was sticking up for the Defendant during this conversation; that [H.S.] had texted her numerous times prior to that conversation and tried to get her to not only change her story but to not go forward with this case. That was [the victim]'s testimony, that [H.S.] tried to persuade her not to continue this case. Now, who do you think put her up to it? Believe me, I can't – [defense counsel] is going to argue I can't prove that, and if I could, there'd – there'd be another – more criminal charges coming his way. I can't prove that right now. Right now I can't. But who makes 400 recorded phone conversations, Ladies and Gentlemen with just the one person? Who does that? Unless they're on a campaign to influence that person into changing what their testimony is going to be?

* * *

[3.] As I've said repeatedly, it's obvious to me that there's been quite a campaign put on by Mr. Furmage to change peoples' testimony in this matter, including recording lots and lots of conversations, apparently so he could play them in court[.]

* * *

[4.] I submit to you that some of the witnesses, at least two that were presented by the defense, I believe were under the influence of drugs when they sat there on that witness stand. I'll leave that for you to determine on your own life experience,

27

Case No. 2020-A-0057

but from where I sat, it appeared to me that at least two witnesses were under the influence of drugs.

{¶79} With respect to the first excerpt above, there was no evidence that Furmage paid H.S. to record her conversation with the victim, and, to the contrary, she testified that she did so only because she believed it the right thing to do. Although the prosecutor's remark may have been improperly based upon his own speculation, we cannot say the remark deprived Furmage of a fair trial given the weight of the evidence against him and the trial court's instruction to the jury.

{¶80} Aside from the first quoted statement above, the defense did not object to the prosecutor's remarks on which he relies to establish prosecutorial misconduct on appeal. Therefore, Furmage has forfeited all argument relative to these statements except that of plain error. "'[N]otice of plain error is to be taken "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice."'" *State v. Bell*, 11th Dist. Lake No. 2015-L-017, 2015-Ohio-4775, ¶ 57, quoting *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph two of the syllabus. "An alleged error does not constitute plain error under Crim.R. 52(B) unless but for the error, the result of the trial would have been different." *Bell* at ¶ 57, citing *State v. Campbell*, 69 Ohio St.3d 38, 41, 630 N.E.2d 339 (1994), citing *Long* at paragraph two of the syllabus.

{¶81} The second and third statements are in similar nature to the first statement, wherein the prosecutor expresses his belief that Furmage was attempting to alter witness testimony by recording telephone conversations. Assuming these remarks were improper, based upon the entirety and context of the remarks, the state's evidence of the offenses, and the trial court's previous admonition to the jury that the remarks were not evidence, we cannot say that the remarks rise to the level of plain error. *See Bell* at ¶ 60.

28

**{¶82}** With respect to the fourth statement, although there may have been some indication obvious at trial but indiscernible from the transcript that sparked the prosecutor's remarks, we agree that the prosecutor's statement of personal belief regarding the witnesses was improper. Nonetheless, Furmage has not shown that but for this statement, the outcome of the trial would have been different. *See Bell* at ¶ 60.

**{¶83}** Accordingly, the sixth assigned error lacks merit.

**{¶84}** In his seventh assigned error, Furmage argues:

**{¶85}** "Appellant was denied the effective assistance of trial counsel."

**{¶86}** To prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate "(1) his counsel was deficient in some aspect of his representation, and (2) there is a reasonable probability, were it not for counsel's errors, the result of the proceedings would have been different." *State v. Hope*, 2019-Ohio-2174, 137 N.E.3d 549, ¶ 88 (11th Dist.), citing *Strickland v. Washington*, 466 U.S. 668, 669, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

**{¶87}** In Ohio, every properly licensed attorney is presumed to be competent, and a defendant bears the burden of proving otherwise. *Hope* at ¶ 89, citing *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985). "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." *State v. Bradley*, 42 Ohio St.3d 136, 142, 538 N.E.2d 373 (1989), paragraph two of the syllabus. Prejudice is established by "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland* at 694.

**{¶88}** Here, Furmage first argues that defense counsel was deficient for failing to move for acquittal pursuant to Crim.R. 29 on the counts alleged to have occurred prior to December 1, 2014, as the victim testified that no abuse occurred prior to moving to the yellow house, and the victim's mother testified that they moved into the yellow house in December 2014.

**{¶89}** "A Crim.R. 29(A) motion challenges the sufficiency of the evidence to support a conviction." *State v. Bell*, 11th Dist. Portage No. 2020-P-0060, 2021-Ohio-899, ¶ 6, citing *State v. Wright*, 11th Dist. Portage No. 2000-P-0128, 2002 WL 480328, *2 (Mar. 29, 2002). "Ordinarily, precise times and dates are not essential elements of offenses." *State v. Scott*, 12th Dist. Clermont Nos. CA2019-07-051 & CA2019-07-052, 2020-Ohio-3230, 155 N.E.3d 56, ¶ 39, citing *State v. Sellards*, 17 Ohio St.3d 169, 171, 478 N.E.2d 781 (1985). "Some Ohio courts have also recognized that '[t]he State is not required to prove that an offense occurred on any specific date, but rather may prove that the offense occurred on a date reasonably near that charged in the indictment.'" *Scott* at ¶ 39, quoting *State v. Miller*, 5th Dist. Licking No. 2006CA00030, 2006-Ohio-6236, ¶ 22 (upholding appellant's conviction where the victim's testimony provided competent, credible evidence from which the jury could find appellant raped the victim on a date reasonably near the date claimed in the indictment); *Tesca v. State*, 108 Ohio St. 287, 140 N.E. 629 (1923), paragraph one of the syllabus ("It is sufficient to prove the alleged offense at or about the time charged.").

30

{¶90} "In sexual abuse cases involving children, * * * it may be impossible to provide a specific date in the indictment." *Scott* at ¶ 40, citing *State v. Vunda*, 12th Dist. Butler Nos. CA2012-07-130 & CA2013-07-113, 2014-Ohio-3449, ¶ 36. "The problem is compounded where the accused and the victim are related or reside in the same household, situations which often facilitate an extended period of abuse." *Scott* at ¶ 40, citing *Vunda* at ¶ 36. ""An allowance for reasonableness and inexactitude must be made for such cases."" *Scott* at ¶ 40, quoting *State v. Birt*, 12th Dist. Butler, 2013-Ohio-1379, 5 N.E.3d 1000, ¶ 32, quoting *State v. Barnes*, 12th Dist. Brown No. CA2010-06-009, 2011-Ohio-5226, ¶ 12. Therefore, courts have held that "failure to prove an offense occurred during the time frame alleged in the indictment is only fatal to the state's claim where an accused would be prejudiced and otherwise denied a fair trial if the state were not required to establish that the date of an offense occurred within the identified range." *Scott* at ¶ 44.

{¶91} Furmage was sentenced for conduct charged to have occurred prior to December 2014, but he has not indicated a way in which his defense was prejudiced by any failure of the state to establish that the offenses occurred within the precise time periods in 2014 as set forth in the indictment. Although the victim's age was an element of the offenses, and the finding that she was under ten years old was required for the rape sentencing on the 2014 offenses, the victim did not turn ten years old until 2017. Therefore, this is not a case where the victim bordered on the age required as an element of the offenses at issue in 2014. Accordingly, we cannot say that trial counsel was ineffective for failing to move for acquittal on this basis.

31

Case No. 2020-A-0057

{¶92} Furmage further argues that defense counsel was deficient for failing to cross-examine the Children Services caseworker who conducted the forensic interview with the victim on her training and experience and failing to call expert witnesses to testify on behalf of the defense as to the issues of forensic training protocols, false allegations of sexual abuse, and the suggestibility of children.

{¶93} "The decision to call a witness is within the province of counsel's trial tactics." *State v. Kovacic*, 11th Dist. Lake No. 2010-L-065, 2012-Ohio-219, 969 N.E.2d 322, ¶ 46, citing *State v. McKay*, 11th Dist. Ashtabula No. 2001-A-0008, 2002-Ohio-3960, ¶ 43. "'Debatable strategic and tactical decisions will not form the basis for a claim of ineffective assistance of counsel, even if there had been a better strategy available.'" *Kovacic* at ¶ 46, quoting *State v. Beesler*, 11th Dist. Ashtabula No. 2002-A-0001, 2003-Ohio-2815, ¶ 13. "Thus, failure to call a witness will not substantiate a claim for ineffective assistance of counsel unless prejudice is shown." *Kovacic* at ¶ 46, citing *Beesler* at ¶ 13.

{¶94} This court cannot speculate as to what testimony would have been elicited from cross-examination of the caseworker or the testimony of expert witnesses; "thus appellant is simply unable to show that the outcome of his trial would have been different" but for trial counsel's alleged deficiency. *See Kovacic* at ¶ 48.

{¶95} Accordingly, Furmage's seventh assigned error lacks merit.

{¶96} In his eighth assigned error, Furmage maintains:

{¶97} "The cumulative effect of multiple errors at trial, even if singularly insufficient to warrant reversal, together deprived Appellant of a fair trial and his constitutional right to due process of law."

32

Case No. 2020-A-0057

**{¶98}** "Under the doctrine of cumulative error, 'a conviction will be reversed where the cumulative effect of errors in a trial deprives a defendant of the constitutional right to a fair trial even though each of numerous instances of trial court error does not individually constitute cause for reversal.'" *State v. Aboytes*, 11th Dist. Lake No. 2020-L-001, 2020-Ohio-6806, ¶ 207-208, quoting *State v. Garner*, 74 Ohio St.3d 49, 64, 656 N.E.2d 623 (1995). "In other words, if this court finds various errors to be harmless error, we may reverse based upon the effect of all of these harmless errors together." *Aboytes* at ¶ 207, citing *State v. Donkers*, 170 Ohio App.3d 509, 2007-Ohio-1557, ¶ 202 (11th Dist.).

**{¶99}** "The doctrine is not applicable to this case as we do not find multiple instances of harmless error." *Aboytes* at ¶ 208, citing *Garner* at 64. Accordingly, Furmage's eight assigned error lacks merit.

**{¶100}** In his ninth assigned error, Furmage contends:

**{¶101}** "The trial court erred in imposing consecutive sentences absent sufficient findings pursuant to R.C. §2929.14 and relied upon inappropriate considerations while imposing Appellant's sentence."

**{¶102}** We review consecutive sentences under R.C. 2953.08(G) and R.C. 2929.14(C)(4). R.C. 2953.08(G)(2) provides:

> The court hearing an appeal under division (A), (B), or (C) of this section shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action

33

authorized by this division if it clearly and convincingly finds either of the following:

(a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;

(b) That the sentence is otherwise contrary to law.

{¶103} There is a statutory presumption that multiple prison terms are to be served concurrently.  R.C. 2929.41(A).

{¶104} However, R.C. 2929.14(C)(4) provides:

If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

{¶105} Here, at sentencing and in the sentencing entry, the trial court found:

34

Case No. 2020-A-0057

Looking at the consecutive sentences factors under 2929.14(C)(4)(b), at least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflect the seriousness of the offender's conduct. And I would find that consecutive sentences should be imposed in this case because they are necessary to protect the public and to punish the Defendant, and they are not disproportionate to the conduct of the Defendant or the danger that he poses to the public.

{¶106} Furmage contends that the trial court made the following two findings when sentencing him that are not supported by the record: (1) "for five years on a daily or every other day basis," Furmage sexually abused the victim, commencing when she was seven years of age, and (2) Furmage "made a lot of digital recordings of everybody [he] talked to," and "it has been generally accepted that anyone who goes to the extreme lengths that [Furmage] went to is guilty."

{¶107} With respect to the latter statements, the trial court made these statements after imposing sentence, and they do not appear to pertain to consecutive sentencing but, instead, to Furmage's guilt. With respect to the former statements, the victim's testimony was that Furmage sexually abused her every day or every other day when she resided at the yellow house, commencing when she was seven years old, until she they moved into the two-story house when she was ten years old. At that point, the victim testified that the abuse lessened to approximately once per week. Although the record may not establish that the abuse occurred nearly every day for five years, the testimony does indicate that the abuse occurred nearly every day for approximately three years, and nearly every week for approximately two years. We cannot clearly and convincingly find that the record does not support the consecutive sentencing factors.

35

{¶108} Accordingly, Furmage's ninth assigned error is without merit.

{¶109} The judgment of the Ashtabula County Court of Common Pleas Is affirmed.

CYNTHIA WESTCOTT RICE, J.,

MATT LYNCH, J.,

concur.

Case No. 2020-A-0057